**Waymond POLLOCKS,
et al., Plaintiffs,**

v.

**SUNLAND TRAINING CENTER,
et al., Defendants.**

No. 87–40103.

United States District Court,
N.D. Florida,
Tallahassee Division.

Feb. 23, 2000.

Peter Kent Spriggs, Kesler Thompson Roberts, Spriggs & Davis PA, Tallahassee, FL, for Waymond Pollocks, Valaria Anderson, Gwenevere Sims Long, Queen Granberry, Marinda A. Hayes, Jennifer Peace Pittman, Erma Calhoun, plaintiffs.

Evelyn Bellamy, Tallahassee, FL, plaintiff, pro se.

Bruce Alexander Minnick, Bruce A. Minnick PA, Tallahassee, FL, Harry F. Chiles, Nabors Giblin & Nickerson PA, Tallahassee, FL, Charles Thomas Collette, Charles T. Collette PA, Tallahassee, FL, Brian Stephen Duffy, Kyle Lee Redfearn, McConnaughhay Duffy Coonrod ETC, Tallahassee, FL, William Murdock Haselden, Cooper Byrne Blue ETC, Tallahassee, FL, for Sunland Training Center at Marianna, Florida, Arthur Basford, Florida Dept. of Health & Rehabilitative Services, Gregory L. Coler, State of Florida, defendants.

## ORDER ON LIABILITY—FIRST GROUP OF PLAINTIFFS

HINKLE, District Judge.

·This is a Title VII action in which 45 plaintiffs allege a pattern of racial discrimination ·in hiring and promotions by the Sunland Training Center in . Marianna, Florida, a state facility for the mentally disabled, spanning the years 1976–1984. By agreement of both sides, the claims have been divided into five discrete groups for purposes of trial on the issue of liability. Trial has been completed on the liability issue with respect to the first group, consisting of five African American plaintiffs who assert they suffered racial discrimination in hiring. This order sets forth the court's findings of fact and conclusions of law on the issue of liability regarding this first group of plaintiffs. I conclude that each of these five plaintiffs was the victim of intentional racial discrimination in hiring in violation of Title VII.

### Introduction

During the period at issue, Sunland was a residential facility for the profoundly retarded. The defendant State of Florida owned and operated the facility.[1] Residents lived in houses, sometimes referred to as "cottages." Basic care for residents, including assistance with such necessities as eating, dressing, bathing and toilet functions, was provided by employees assigned to the various cottages; these caregiving employees were known as "cottage parents."[2]

The five plaintiffs now before the court applied many times during the period at

---

1. Defendants are the State of Florida and two state entities: Sunland and the Department of Children and Families (of which Sunland is a part). For ease of reference, this order refers to the defendants collectively as "the state."

2. The job description labeled this "routine work" with duties including "restraining overactive or disciplinary problem retardates, assisting retardates in personal hygiene activi- ties, dispensing prescribed medications and performing general custodial work in the residential cottages." The job description included as examples of work performed training or assisting residents in personal hygiene activities, escorting them to and from the dining room or other facilities, feeding residents who could not feed themselves and assisting others, performing laundry and custodial duties,

issue for the job of "cottage parent." The only stated qualifications for the job were a high school diploma or "[e]xperience in rearing a family or in related custodial or nursing environments"; such experience could be "substituted on a year-for-year basis for the high school education requirement." The five plaintiffs all had high school diplomas as well as experience of this type, but they were passed over many times for the position of cottage parent. They also applied for but failed to obtain other jobs at Sunland for which they were qualified.

When it opened, Sunland had separate houses for African Americans and whites, respectively. African Americans were substantially under-represented among Sunland employees. By 1976, the first year at issue in the case at bar, however, segregated housing had been eliminated, and African American hiring was on the upswing. Indeed, Sunland made substantial and commendable efforts to increase African American hiring throughout the 1976–1984 period.

Still, African American applicants did not receive the same treatment as whites with respect to hiring for the positions at issue. African Americans, including these five plaintiffs, suffered intentional racial discrimination in hiring for these positions throughout this period. This is shown by (1) statistical evidence indicating that Sunland hired a substantially lower percentage of qualified African Americans for these positions than would have been expected if decisions had been made without intentional discrimination, (2) evidence of the goals and policies that Sunland administrators followed during this period intended to raise African American hiring but to do so to a level significantly below the level that would have been achieved by non-discriminatory hiring, and (3) evidence of the specific treatment of the plaintiffs as analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This order begins

and observing residents for behavioral

by recounting briefly the procedural history of this action, then summarizes the applicable legal principles, and then addresses in turn each of these three sources of proof.

### Procedural Background

This litigation traces its origin to a class action complaint filed in this court on February 11, 1977, alleging a pattern of racial discrimination in initial hiring and promotions at Sunland in violation of Title VII of the Civil Rights Act of 1964, as amended. The first named plaintiff was Mary Worlds; the action became known as the *Worlds* case. The court initially certified a class but later decertified the class, effective as of June 1, 1985. The court notified former class members that they could seek to intervene by not later than July 31, 1985.

The plaintiffs in the case at bar were members of the *Worlds* class but were not named plaintiffs in that case. When the class was decertified, they filed a timely motion to intervene in *Worlds.* By order dated April 24, 1987, the court denied the motion. Six days later, on April 30, 1987, plaintiffs filed the case at bar.

The court in *Worlds* ultimately ruled that one plaintiff had been the subject of racial discrimination in hiring at Sunland but was entitled to no relief because he had made only token efforts to secure other, readily available employment over a period of some 13 years. The court ruled that the other *Worlds* plaintiffs had not been victims of racial discrimination. The *Worlds* plaintiffs appealed, and the state cross-appealed. The parties in the case at bar agreed that this action should be stayed pending resolution of the *Worlds* appeal.

By order dated May 13, 1997, the Eleventh Circuit affirmed this court "on all rulings." *Worlds v. Department of Health,* 116 F.3d 491 (11th Cir.1997) (unpublished opinion at 2). In due course, litigation of the case at bar resumed. Defenses arising from the requirement for

changes. (Pl.Ex.65.)

the filing of administrative charges as a prerequisite to a Title VII action have been addressed by separate orders and remain pending. Subject to those defenses, this order resolves the issue of liability for the five plaintiffs whose cases have been tried.

### Applicable Law

Title VII of the Civil Rights Act of 1964, as amended, prohibits discrimination in employment based on race or other specified characteristics. *See* 42 U.S.C. § 2000e–2(a)(1). If, as plaintiffs claim, the persons making hiring decisions at Sunland considered plaintiffs' race as an adverse factor in the employment process, then the state violated Title VII. This legal principle is beyond dispute and, indeed, is not disputed by the state in this case.

It also is undisputed that plaintiffs who allege intentional discrimination in hiring may prove their cases in at least two ways: through direct evidence of discrimination (for example, testimony or other statements of the employer that race was a reason for the hiring decision at issue) or through the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which focuses on the employer's hiring decision with respect to a specific position on a specific occasion. At least in class actions, plaintiffs also may prove their case in a third way: by proof that the employer has followed a pattern or practice of intentional discrimination. *See, e.g., Franks v. Bowman Transp. Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). The parties disagree on whether the pattern or practice method of proof is also available in a case that, like the case at bar, is not a class action.

■ It probably would be futile, and in any event it clearly is unnecessary in the case at bar, to attempt to set down an exhaustive list of, and definitive rules governing, the manner in which Title VII plaintiffs may prove their cases. The issue ultimately is whether, in making the employment decision at issue, the employer engaged in intentional discrimination based on a prohibited factor such as race. *McDonnell Douglas* sets forth a convention by which this issue may be addressed. But *McDonnell Douglas* does not create additional substantive elements of a Title VII case, over and above intentional discrimination, that a plaintiff must prove in order to prevail. Thus a plaintiff who proves intentional racial discrimination through admissible evidence is entitled to prevail without regard to whether he or she proves a "prima facie case" as defined in *McDonnell Douglas*.[3] Such evidence may include proof of a pattern or practice, so long as the pattern or practice evidence,

---

**3.** The use of the terminology "prima facie case" in *McDonnell Douglas* is perhaps unfortunate. The term "prima facie case" is sometimes used in other contexts to mean the elements on which the plaintiff *must* present evidence in order to have the matter submitted to the finder of fact. In Title VII cases, however, a plaintiff need not proceed under *McDonnell Douglas* at all; as is beyond dispute, a plaintiff may proceed based on "direct evidence" of intentional discrimination without prop of a *McDonnell Douglas* "prima facie case." The better view is that a plaintiff also may proceed based on any other evidence from which a finder of fact reasonably could find intentional discrimination. *See, e.g., Wright v. Southland Corp.*, 187 F.3d 1287, 1292–93 (11th Cir.1999) (noting that a plaintiff may "forego *McDonnell Douglas* and simply attempt to prove illegal discrimination 'under the ordinary standards of proof' "), quoting *EEOC v. Clay Printing Co.*, 955 F.2d 936, 940 (4th Cir.1992); *Hill v. Metropolitan Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1540 (11th Cir.) (finding that plaintiffs "are not required to adopt a *McDonnell Douglas* approach" and may use proof of employer actions from which one may infer discriminatory motivation more likely than not), *modified*, 848 F.2d 1522 (11th Cir.1988). The contrary view would be inconsistent with the plain language of Title VII (which allows recovery for intentional discrimination), the Federal Rules of Evidence and particularly Rule 402 (which provide that relevant evidence generally is admissible and do not restrict proof to a particular method), and cases allowing other plaintiffs (either the government or class representatives) to use other methods of proof with respect to precisely the same substantive Title VII standard (that is, the same issue of intentional discrimination). *See, e.g., International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52

together with all the other evidence in the case, shows that the employer engaged in intentional racial discrimination with respect to the particular employment decision at issue.[4]

▮ In the case at bar, plaintiffs have produced no "direct evidence" of intentional racial discrimination in hiring during the period at issue. Plaintiffs have proceeded under *McDonnell Douglas* and also have presented statistical and other evidence of a pattern and practice of racial discrimination in hiring. I find that there was a pattern and practice of racially discriminatory hiring for the positions at issue at Sunland during the period 1976–1984. I also conclude that plaintiffs have proven their entitlement to prevail under *McDonnell Douglas* with respect to numerous individual positions. And even if, as the state asserts, plaintiffs properly could proceed only under *McDonnell Douglas,* plaintiffs' statistical and other evidence would remain admissible on the ultimate question of whether the hiring decisions at issue resulted from intentional racial discrimination. For the reasons that follow, I find that plaintiffs were victims of intentional racial discrimination in violation of Title VII and that, but for that discrimination, they would have been hired for specific positions they have identified.

### Proof of Discrimination

### I. *STATISTICAL PROOF*

▮ Courts long have recognized that statistical evidence may be relevant in as-

sessing whether an employer has engaged in intentional discrimination. *See, e.g., Hazelwood School Dist. v. United States,* 433 U.S. 299, 307, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Such evidence is relevant in hiring cases because one would expect that, if an employer makes hiring decisions without regard to race, then given enough hiring decisions, the proportion of hires of a given race would approximate the proportion of qualified applicants of that race, other things being equal. *Id.; International Bhd. of Teamsters v. United States,* 431 U.S. 324, 339–40 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Some deviation between the percentage of hires and the percentage of qualified applicants, by race, of course would be expected, simply as a result of chance. But the odds that a deviation of a given magnitude would result solely as a matter of chance are also subject to calculation.

The relevant statistical analysis starts, then, with (1) a compilation of the employer's actual hiring record by race for the type of position at issue during the time period at issue, and (2) a determination of the racial composition of the pool of qualified applicants to the employer for the type of position at issue during the time period at issue. The racial composition of the pool of qualified applicants is sometimes referred to as the "benchmark," because it is the approximate result that race-neutral hiring would achieve, on average, given enough hiring decisions, and it therefore provides a reference or "bench-

L.Ed.2d 396 (1977) (recognizing pattern or practice proof in government action); *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (recognizing pattern or practice proof in private class action).

4. Courts have held that, in class actions, a showing of a pattern or practice of discrimination shifts the burden to the employer to show that any individual class member was not a victim of discrimination. *See, e.g., Franks v. Bowman Transp. Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). Under the law of the circuit, however, the same rule apparently does not apply in individual actions such as the case at bar. *See, e.g., Carter*

*v. Three Springs Residential Treatment,* 132 F.3d 635, 642 n. 5 (11th Cir.1998) (asserting that statistics alone cannot carry plaintiff's burden of production in individual disparate treatment case); *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1131 (11th Cir. 1984) (requiring individual disparate treatment plaintiff to point to specific instance of discrimination in order to ascertain economic loss rather than rely exclusively on statistical evidence). Thus in an individual action, the initial burden of production and the ultimate burden of persuasion are on the plaintiff; and a pattern and practice showing, without more, apparently would not be sufficient to carry either burden.

mark" to which the employer's actual hiring results can be compared.

In the case at bar, the quality of available information on hiring for the positions at issue, by race, and on qualified applicants for the positions at issue, by race, is far from perfect. Both sides have submitted expert testimony compiling and interpreting statistical evidence derived from the imperfect available information. Not surprisingly, the parties and their experts disagree in various respects.

■ The parties' principal disagreement is on the appropriate source that should be used to determine the benchmark. Plaintiffs' expert Dr. David W. Rasmussen has compiled data on actual applications to the Sunland facility for positions of the types and during the periods at issue. Defendants' expert, Dr. Paul H. White, asserts that the data on actual applications are too unreliable to be used, so he has used census data (that is, information on persons designated in the category of jobs at issue in the same geographic area) as a proxy for data on actual applications.[5]

I find Dr. Rasmussen's analysis credible. I conclude that the actual applicant flow data used by Dr. Rasmussen, while imperfect, are data of a type reasonably relied upon by experts in the field and thus provide a proper basis for his expert testimony. *See* Fed.R.Evid. 703; *see also Bazemore v. Friday*, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (recognizing that statistical evidence need not be perfect to have probative value and holding erroneous district court's failure to consider probative but imperfect statistical evidence). I find that these actual applicant flow data provide a far better benchmark against which to measure Sunland's hiring record than the census data used by Dr. White. I find that, under the circumstances of this particular case, the census data relied upon by Dr. White provide an unreliable benchmark.

The positions most at issue with respect to the five plaintiffs whose cases have been tried include the position of cottage parent and other positions within the "paraprofessional" category denominated as category EEO 5. Dr. Rasmussen's analysis indicates that the appropriate benchmark for hiring of African Americans in category EEO 5 jobs at Sunland, calculated based on actual applications, was 50%. For the period 1977–1980, however, only 66 of 274 persons hired for such jobs at Sunland (or 24%) were African American. For the period 1981–1984, only 52 of 176 persons hired for such jobs at Sunland (or 29.5%) were African American. These statistics produce standard deviations for these periods of $-8.58$ and $-5.43$, respectively, which in turn indicate that, other things being equal, such a low percentage of African American hires would result by chance far less than one time in a thousand. The odds of such a low percentage of African American hires for the 1977–1980 period occurring by chance, and being followed by such a low percentage of African American hires for the 1981–1984 period again by chance, are long indeed.

Dr. Rasmussen's analysis, including his use of a 50% benchmark, draw additional support from the apparently undisputed evidence of actual hiring at Sunland beginning in 1985. In 1985, Sunland hired 50 new employees in category EEO 5, of which 27 (or 54%) were African American. In 1986, Sunland hired 20 new EEO 5 employees, of which 11 (or 55%) were African American. In 1987, Sunland hired 33 new EEO 5 employees, of which 19 (or 57.6%) were African American. A reasonable inference is that the available pool of EEO 5 applicants at Sunland has approximated 50%, just as Dr. Rasmussen concluded, that from 1976–1984 the race of African American applicants was a negative factor in the hiring process, and that the discrimination ended in 1985.

---

**5.** Dr. White relied in part on work done earlier by other professionals in his firm. For convenience, I refer to Dr. White to mean not only Dr. White personally but also the others whose work he presented at trial.

I do not find credible Dr. White's contrary analysis, which resulted in a 30.9% benchmark for African American hiring in category EEO 5 based on census data showing that, in the appropriately-weighted relevant geographic area, 30.9% of persons designated in category EEO 5 jobs were African American. First, as a matter of principle, actual applicant flow data (if available), not census data, provide the appropriate benchmark. *See, e.g., Payne v. Travenol Lab., Inc.,* 673 F.2d 798, 823–24 (5th Cir.1982) (recognizing that reliable applicant flow data rather than population data provide appropriate benchmark against which hiring record should be measured). This is because hiring decisions at Sunland were made from applicants for positions at Sunland, not from persons counted in the applicable job category in the census. If, as appears to have been the case, 50% of the qualified applicants for EEO 5 jobs at Sunland were African American while 30.9% of persons counted in the census in category EEO 5 in the geographic area were African American, one would expect Sunland to have hired roughly 50% African Americans for EEO 5 jobs at Sunland, not 30.9%, if indeed hiring at Sunland was done on a race-neutral basis. *Id.*

Dr. White does not dispute this. He says, however, that Dr. Rasmussen's data are so unreliable they should not be used. Dr. White thus says there is no reliable evidence that in fact 50% of qualified applicants for EEO 5 positions at Sunland during the 1976–1984 period were African American. Dr. White says the best reliable data are the census data, showing that 30.9% of EEO 5 persons in the appropriately-weighted geographic area were African American. Dr. White thus says the appropriate benchmark is 30.9%.[6]

Some of Dr. White's criticisms of Dr. Rasmussen's data are incorrect, and some deal with alleged errors so small that they would have no material effect on Dr. Rasmussen's ultimate conclusions. More fundamentally, Dr. White has identified no race-sensitive errors (that is, errors that would be expected to skew Dr. Rasmussen's results along racial lines), no errors that explain the striking increase in African American hiring for the years 1985–1987, no errors that explain the close correlation between Dr. Rasmussen's benchmark and actual hiring for the years 1985–1987, and no errors that explain the substantial divergence between Dr. White's benchmark and actual hiring for the years 1985–1987.

This latter point is especially significant. Sunland's hiring record for 1985–1987 is much more consistent with Dr. Rasmussen's view that an appropriate benchmark for African American hiring in category EEO 5 at Sunland was 50% than with Dr. White's view based on census data that an appropriate benchmark was only 30.9%. Dr. White has offered no explanation for why, if his analysis is correct, the hiring rate for African Americans in category EEO 5 at Sunland consistently exceeded 50% for the years 1985–1987.[7]

6. Dr. White of course is correct that census data may appropriately be considered when reliable applicant flow data are unavailable. Census data also may be considered even when reliable applicant flow data are available. Whether census data are probative, and what they prove, depend on the factual circumstances of the particular case. I have considered the census data and Dr. White's analysis, together with all the evidence in this case, and make the findings and conclusions set forth in the text.

7. Dr. White did assert that prior to 1985, there was a "preference" for applicants for the position of cottage parent who were high school graduates, and he suggested that the elimination of this preference in 1985 may have affected hiring by race. The evidence does not support that claim. During the period 1980–1984, the job description for cottage parent required a high school diploma but provided, "Experience in rearing a family or in related custodial or nursing environments may be substituted on a year-for-year basis for the high school education requirement." (Def.Ex.61C.) No preference was given as between applicants with a high school diploma, on the one hand, and applicants with qualifying substitute experience, on the other. In any event, there is no evidence in this record regarding the relative high school graduation rates or substitute experience rates among applicants by race; there is thus no evidence

In short, I find that Dr. Rasmussen's 50% benchmark is analytically sound, supported by imperfect but reasonably reliable data, and far more consistent with the undisputed evidence regarding actual hiring during the years 1985–1987 than Dr. White's proposed benchmark.

That the 50% benchmark dramatically exceeds the 30.9% African American share of EEO 5 persons in the geographic area does not undermine these conclusions. A reasonable hypothesis is that African Americans applied for cottage parent positions at Sunland in numbers disproportionate to their representation in the census. This would not be surprising for at least two reasons. First, as this record confirms without dispute, African Americans faced a substantially higher unemployment rate in the relevant geographic area at the relevant time than whites. There were thus a higher percentage of African Americans looking for work than projected by Dr. White's analysis, which took no account of the relative unemployment rates by race. Second, the position of cottage parent is a demanding and sometimes unpleasant and even demeaning position that one reasonably would expect to attract a disproportionate share of applicants with historically lower expectations and fewer good alternatives; this in turn would include a disproportionate share of African Americans, who in Jackson and surrounding counties of Florida in 1976 and even in 1984 faced not only higher unemployment but also continuing racial discrimination, at least from some employers. Thus one would not reasonably expect the racial breakdown of applicants for the position of cottage parent at Sunland to mirror the census data used by Dr. White, and one would not reasonably be surprised if, as Dr. Rasmussen determined for the period 1976–1984 and as the actual hiring record suggested for the period 1985–1987, as many as 50% or more of the applicants for the position were African American.

Finally, even Dr. White's own analysis suggests there was racial discrimination in hiring for EEO 5 positions at Sunland for the years 1976–1980. His report concludes that Sunland hired 211 persons in category EEO 5 during that period, only 50 of whom were African American. Using Dr. White's census-based benchmark of 30.9%, one would have expected Sunland to hire 65.2 African Americans, not 50. This produces a standard deviation of $-2.187$, which social scientists would regard as statistically significant; the odds of such a result occurring by chance, other things being equal, are roughly 3/100. This evidence standing alone is hardly overwhelming, but it does support the conclusion that Sunland's hiring in category EEO 5 was not race neutral.

In sum, the statistical evidence indicates that Sunland's pattern and practice during the years 1976–1984 was to engage in intentional discrimination against African Americans who, like plaintiffs, applied for positions in category EEO 5.

## II. *SUNLAND'S EXPRESSED GOALS*

Further support for this conclusion comes from the testimony of Sunland administrators concerning their hiring goals during the 1976–1984 period.

that elimination of the high-school-or-substitute-experience requirement affected hiring by race. More importantly, beginning in 1985, there clearly was no high school requirement. Dr. White has offered no explanation for why Sunland hired more than 50% African Americans in category EEO 5 for the years 1985, 1986 and 1987, if indeed the appropriate benchmark for those years was 30.9%, as he asserts. That hiring in 1985–1987 was consistent with Dr. Rasmussen's benchmark, not with Dr. White's benchmark, had nothing to do with high school diplomas, which clearly were not required in those years. And finally, Dr. Rasmussen's analysis showing the appropriate benchmark as 50% for 1984 and earlier used state lists of *qualified* applicants, that is, applicants who met the requirement for high school or substitute experience. (The state says those lists were imperfect, and presumably they were, but there is no reason to believe there were material errors or errors skewed along racial lines.)

As of 1976, the Civil Rights Act of 1964 had been in effect for only 12 years and had been applicable to the states for only four years. The Constitution itself and other statutes had of course predated Title VII, but decisions recognizing their effect on state hiring were not of long standing. As of 1976, the workforce at Sunland still reflected the effects of earlier race-based hiring.

Commendably, Sunland administrators and state officials in Tallahassee were engaged throughout the 1976–1984 period in a good faith effort to improve African American hiring. Unfortunately, they set as a goal bringing African American hiring up to a level that would match the African American population in the geographic area.[8] The result was that supervisors who received 50% African American applications were nonetheless under instructions to bring African American hiring up to a level of around 30%. Phrased differently, the message to hiring authorities was that they could discriminate against African American applicants, so long as the frequency of the discrimination was not too severe.[9]

The actual results obtained at Sunland are consistent with a finding that the announced goal had a discriminatory effect on hiring. Dr. White's benchmark, based on census data for employment category EEO 5, was not substantially different from Sunland's announced goal, based on population. Dr. White's analysis showed that Sunland's African American EEO 5 hiring for the period of 1976–1980 fell significantly (although not drastically) below his benchmark, while by the period 1981–1984, hiring approached his benchmark. A reasonable inference is that African American hiring improved from 1976 forward,

reaching the announced goal for the period 1981–1984. The announced goal, however, fell substantially below what Title VII required: non-discriminatory hiring.

In short, Sunland's administrators had the laudable goal of improving African American hiring. They chose a target employment rate, however, that fell far short of what would be produced by the non-discriminatory hiring the law required, because of a significant divergence between the African American share of the population in the geographic area and the African American share of applications for the positions here at issue. When the flawed target was implemented by hiring authorities, the result was discrimination against African Americans, albeit discrimination less severe than had been in place earlier, and less severe than undoubtedly still was in place among some other employers in Jackson and surrounding counties.

## III. MCDONNELL–DOUGLAS

That there was employment discrimination at Sunland in the types of position at issue of course does not necessarily mean that the five plaintiffs now before the court were victims of that discrimination. Their specific circumstances may be analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Under that framework, the initial burden is on the plaintiff to establish a "prima facie case." The Eleventh Circuit has de-

---

8. This was the testimony of Melvin L. Herring and Joseph Kennedy. Nobody testified that Sunland's goal at the time was to have hiring mirror the racial distribution of qualified applicants (as one would expect, on average, from nondiscriminatory hiring). The state's affirmative action studies did show applicant flow data, but the testimony was that the actual goal at the facility was based on population.

9. If applicants were 50% African American and 50% white but hiring authorities were told to hire 30% African Americans, then hiring authorities were free to hire whites more than twice as frequently as African Americans (70% compared to 30%), despite receiving equal numbers of applications. A system that gives whites more than twice the chance of being hired, other things being equal, is discriminatory.

fined a prima facie case for this purpose as follows:

> [P]laintiffs may establish a prima facie violation by showing that they are members of a group protected by title VII, that they sought and were qualified for positions that [the defendant employer] was attempting to fill, that despite their qualifications they were rejected, and that after their rejection [the employer] either continued to attempt to fill the positions or in fact filled the positions with [persons outside plaintiff's protected class].

*Walker v. Mortham,* 158 F.3d 1177, 1187 (11th Cir.1998) (bracketing in original in part), *quoting Crawford v. Western Elec. Co.,* 614 F.2d 1300, 1315 (5th Cir.1980), *citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to present evidence that it acted for a legitimate, non-discriminatory reason. While this burden is "exceedingly light," *Holifield v. Reno,* 115 F.3d 1555, 1564 (11th Cir.1997), it cannot be met solely by a defendant's presentation of legal argument or after-the-fact rationalizations; the defendant must present "admissible evidence" of the actual reason for the action at issue. *See, e.g., Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). So long as the articulated reason is not based on race or other prohibited characteristics, it need not be a reason that seems wise or logical; under Title VII, an employer lawfully may take action for any non-discriminatory reason, good or bad, fair or unfair, or for no reason at all. *See, e.g., Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir.1997) (noting that employee cannot overcome employer's proffered reason "merely by questioning the wisdom of the employer's reason").

If the defendant meets the requirement of presenting evidence of a non-discriminatory reason for its action, the burden is on the plaintiff to establish that defendant's proffered reason is pretextual and that the plaintiff has been the victim of discrimination. On this issue, the statistical and other evidence addressed in earlier sections of this order, as well as all other relevant evidence, may be considered.

I find that each of the five plaintiffs now before the court has established a *McDonnell Douglas* prima facie case with respect to various positions; that the state has provided legitimate, non-discriminatory reasons for some of the hiring decisions at issue but has failed to provide such reasons for many others; and that many of the proffered legitimate, non-discriminatory reasons are clearly pretextual. I find that each plaintiff was the victim of intentional discrimination and that absent such discrimination each plaintiff would have been hired at Sunland during the period at issue. The reasons underlying these conclusions, with specific examples illustrating the reasoning, are set forth in the text below. An appendix to this order sets forth my conclusions with respect to each plaintiff and each specific position at issue.[10]

### A. *Prima Facie Case*

Plaintiff Gwenevere Long is African American. From July 1977 through some time in 1983, she submitted 15 to 20 applications per year to Sunland for positions including cottage parent, residential train-

---

**10.** The positions listed in the appendices are culled from the following sources: (1) application documentation submitted by the parties, (2) plaintiffs' handwritten charts listing all positions applied for during the relevant time period, and (3) positions listed in the state's contemporaneous documentation (Forms 900) as having been applied for by plaintiffs. Findings with respect to the positions are derived from the testimony at trial and all exhibits. The appendices have been compiled without benefit of proposed findings of fact or other detailed submissions from the parties after trial. If any party asserts there are specific factual errors in the appendices or in this order, the party should raise the issue by motion for reconsideration, supported by specific citation to appropriate record sources.

ing instructor, dietary worker, and laundry worker.[11] She was qualified for these positions.[12] She was never offered any job. Many of the successful applicants were white.[13] Ms. Long has met the *McDonnell Douglas* four-part test establishing a prima facie case with respect to each such specifically identified position filled with a white person.

Plaintiff Queen Granberry is African American. She repeatedly applied for positions at Sunland from May 1969 (well before the beginning of the period at issue) through some time in 1980. Among the positions for which she applied were cottage parent, food service aide, residential training instructor, and beautician. She was qualified for these positions.[14] She was never offered any job. Many of the

successful applicants were white.[15] Ms. Granberry has met the *McDonnell Douglas* four-part test establishing a prima facie case with respect to each such specifically identified position filled with a white person.

Plaintiff Marinda Hayes is African American. She applied for positions at Sunland approximately eight or nine times per year from the early 1970s (well before the beginning of the period at issue) through some time in 1982. Among the positions for which she applied were cottage parent, food service aide, and cook. She was qualified for these positions.[16] She was never offered any job. At least some of the successful applicants were white.[17] Ms. Hayes has met the *McDonnell Douglas* four-part test establishing a

11. This was Ms. Long's uncontradicted testimony. Records no longer exist of all applications for these positions. Documentary evidence does, however, confirm some of Ms. Long's applications. *See, e.g.*, Pl.Ex. 20B, 20C & 20G; Def.Ex. 65 E–1, E–2 & E–6.

12. *Ms. Long received her high school diploma* in 1976. Her work experience in the field of providing residential care included almost a year as a dietary aide at Marianna Convalescent Center, a nursing home; more than a year as a nurse's aide at Marianna Convalescent Center; a period beginning in December 1979 as a nurse's aide at Jackson County Convalescent Center; and six-month periods in 1973 and 1980 working in cottages at Sunland under the CETA program. As confirmation she met the minimum requirements of the jobs, Ms. Long was interviewed twice for the position of cottage parent and at least once for resident training instructor.

13. This is a reasonable inference from the number of applications submitted and the percentage of whites hired for positions of this type. In addition, the record includes documentation that for many of the positions for which Ms. Long applied, the successful applicant was white. Examples include cottage parent position 12031 filled February 15, 1980 (Pl.Ex. 20B; Def.Ex. 65 E–1); cottage parent position 12017 filled September 26, 1980 (Pl.Ex. 20C; Def.Ex. 65 E–2); and cottage parent position 11986 filled January 23, 1981 (Pl.Ex. 20L; Def.Ex. 65 E–11).

14. Ms. Granberry graduated from high school in 1967. She received a cosmetology certificate from a junior college in 1968 and main-

tained a cosmetology license. Her relevant experience included one year as a teacher's aide at a high school and a summer as a CETA worker at Sunland, in addition to caring for her grandmother for three years and for a deaf mute aunt for 15 years. These credentials easily met the qualifications for the positions noted in the text. Ms. Granberry also applied for secretary and clerk-typist positions but was not qualified because she did not have the required state typing certification.

15. Examples include cottage parent position 11986 filled September 28, 1979 (Pl.Ex. 23G; Def.Ex. 65 F. –1); cottage parent position 12053 filled October 26, 1979 (Pl.Ex.23J); (Def.Ex. 65 F. –4); and cottage parent position 12036 filled May 9, 1980 (Pl.Ex. 23T; Def.Ex. 65 F–13).

16. Ms. Hayes graduated from high school in 1961. Her relevant experience included caring for her 88–year–old grandmother, caring for her blind uncle, assisting in caring for her ten siblings, and working as a private caretaker for an individual. These credentials easily met the qualifications for the positions noted in the text. Ms. Hayes also applied for secretary and clerk-typist positions but was not qualified because she did not have the required state typing certification.

17. Examples include cottage parent position 11904 filled on or about January 19, 1982 (Pl.Ex. 24A; Def.Ex. 65 G–1); and cottage parent position 12005 filled on or about January 19, 1982 (Def.Ex. 65 G–1).

prima facie case with respect to the specifically identified positions filled with a white person.

Plaintiff Jennifer Pittman is African American. She applied for positions beginning in June 1977, left the geographic area and stopped applying later that year, returned and began applying again in March 1980. Among the positions for which she applied were cottage parent, food service aide, and custodian. She was qualified for these positions but was rejected many times.[18] Many of the successful applicants were white.[19] Ms. Pittman has met the *McDonnell Douglas* four-part test establishing a prima facie case with respect to each such specifically identified position filled with a white person.

Plaintiff Erma Calhoun is African American. She constantly applied for positions at Sunland beginning in 1972 (well before the beginning of the period at issue) and continuing throughout the period at issue. Among the positions for which she applied were cottage parent, food service aide, nursing assistant, and laundry worker. She was qualified for these positions.[20] She was never offered any job. Many of the successful applicants were white.[21] Ms. Calhoun has met the *McDonnell*

*Douglas* four-part test establishing a prima facie case with respect to each such specifically identified position filled with a white person.

**B.** *Alleged Non–Discriminatory Reasons*

■ Prior to trial, plaintiffs propounded to the state an interrogatory asking for Sunland's alleged legitimate, nondiscriminatory reason for choosing the successful white applicant for every position at issue. The state responded with no specific reason for any decision. The state said that, if plaintiffs "by competent substantial evidence can establish having applied for any other positions, then Defendants respond upon their best information and belief that the best qualified applicant was chosen." *See, e.g.* Pl.Ex. 71. Under the law of the circuit, such a general, conclusory assertion is not sufficient to meet the employer's burden of providing a legitimate, non-discriminatory reason for a decision, in response to an employee's prima facie case. *See, e.g., IMPACT v. Firestone,* 893 F.2d 1189, 1194 (11th Cir.1990).

For some positions, the state failed to proffer any legitimate, non-discriminatory reason for selecting a white applicant over the plaintiff, other than the conclusory interrogatory answer.[22] With respect to

---

**18.** Ms. Pittman graduated from high school in 1977. Her relevant experience included three months as a CETA worker at Sunland. Ms. Pittman thus clearly was qualified for the position of cottage parent. In addition, she was offered and accepted positions at Sunland as custodian in October 1982 and food service aide in July 1983; she thus clearly was qualified for those positions. The record does not establish that she met the minimum qualifications for other positions for which she applied, including residential training instructor, security guard, trades helper, and nursing assistant.

**19.** Examples include cottage parent position 11909 filled January 16, 1981 (Pl.Ex. 28C; Def.Ex. 65 H–1); cottage parent position 11986 filled January 23, 1981 (Pl.Ex. 28B; Def.Ex. 65 H–2); and cottage parent position 12020 filled on or about July 1981 (Pl.Ex. 28H; Def.Ex. 65 H–6).

**20.** Ms. Calhoun graduated from high school in 1973. Her relevant experience included

more than four years at Florida State Hospital, the state's public mental health in-patient facility, as a psychological aide and doing food service, housekeeping and custodial work. She also raised five children. These credentials easily met the qualifications for the positions noted in the text. Ms. Calhoun also applied for positions of resident training instructor, cook II, and human service worker, but the record does not establish that she was qualified for these positions.

**21.** Examples include cottage parent position 12005 filled on or about February 19, 1982 (Pl.Ex. 26Y; Def.Ex. 65 I–22); cottage parent position 12055 filled on January 16, 1981 (Def.Ex. 65 I–17); and cottage parent position 11932 filled on February 19, 1982 (Pl.Ex. 36Z; Def.Ex. 65 I–21).

**22.** Examples include cottage parent position 12031 filled February 15, 1980 (Pl.Ex. 20B; Def.Ex. 65 E–1) and cottage parent position 12014 filled October 17, 1980 (Pl.Ex. 20G).

those positions, plaintiffs are entitled to prevail, based on their presentation of an unrebutted prima facie case.[23]

For other positions, the state presented evidence at trial over and above its interrogatory answer. I admitted the evidence so that the record would be complete, notwithstanding the unfairness of allowing the state to proceed in this manner. The state's failure to answer the interrogatory with a candid description of the position it intended to present at trial was inexcusable.

■ In addition, in many instances the non-discriminatory reason offered by the state at trial was merely an after-the-fact rationalization conjured by a person who did not participate in the hiring decision and did not know the true basis of the decision to hire the white winner. An employer does not meet its burden by proffering such an after-the-fact hypothesis; the employer's burden is to present "admissible evidence" of the actual reason for the action at issue. *See, e.g., Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 775 (11th Cir. 1982).[24]

These procedural flaws in the state's presentation would justify rejecting the state's proffered explanations. The unavailability of better proof, however, is not solely the state's fault. In a case alleging racial discrimination in a major state institution and seeking equitable relief, the state ought not lightly be foreclosed from presenting its best case on the merits. I thus have considered on the merits the evidence presented by the state at trial regarding Sunland's reasons for the hiring decisions at issue. For the most part, those reasons (if supported by evidence that they were the true reasons) would constitute legitimate, non-discriminatory reasons sufficient to carry the state's intermediate *McDonnell Douglas* burden.[25]

Thus, for most positions for which the state offered testimony at trial of a reason why the white winner was selected over the plaintiff, I proceed on the assumption that the state has successfully met its intermediate burden, thus placing on plaintiffs the burden of proving, by the greater weight of the evidence, that each proffered reason was pretextual and that intentional discrimination was a reason for the hiring decision at issue.

---

23. I credit the prima facie case presented by each plaintiff. I do not credit the state's conclusory assertion that the person hired for each such position was better qualified than the plaintiff. That conclusory assertion (1) is insufficient as a matter of law to carry the employer's burden under *McDonnell Douglas;* (2) has not been supported by admissible testimony of any person with knowledge of the hiring decisions; (3) is contrary to evidence that in many instances the white winner was not better qualified than unsuccessful African American applicants including plaintiffs; and (4) is not credible.

24. *See also McDonald v. United Air Lines, Inc.,* 745 F.2d 1081, 1087 (7th Cir.1984) (stating that defendant's asserted legitimate non-discriminatory reason "must be based on admissible evidence"); *White v. Vathally,* 570 F.Supp. 1431 (D.Mass.1983) (Keeton, J.) (stating that in order to rebut prima facie case of discrimination in hiring, employer must raise a "genuine issue of fact ... by introducing evidence setting forth the reason for" the hir-

ing decision at issue), *aff'd,* 732 F.2d 1037 (1st Cir.1984); *Halfond v. Legal Aid Soc'y,* 70 F.Supp.2d 155, 163 (E.D.N.Y.1998) (rejecting defendant's reliance on asserted reasons for adverse action in absence of evidence that those reasons were relied upon by actual decision makers); *O'Halpin v. Nassau County Police Dep't,* 670 F.Supp. 75, 79 (E.D.N.Y.1987) (rejecting defendant's reliance on testimony of counsel who had no personal knowledge of hiring decision at issue; in absence of testimony by decision maker that proffered reason was actual reason for decision, defendant failed to carry its intermediate burden under *McDonnell Douglas* ).

25. The proffered reasons included preference for hiring any current Sunland employee; preference for hiring veterans; preference for having males in at least some cottage parent positions in at least some male cottages and having females in at least some cottage parent positions in at least some female cottages; and various alleged comparative rankings of different types of experience or work history.

## C. *Pretext*

Some of the state's proffered reasons for hiring decisions were not pretextual. The record establishes that, for the most part, Sunland gave a very strong preference to current Sunland employees over applicants from outside. Sunland gave a substantial, although not necessarily dispositive, preference to veterans. Sunland often, although not always, gave a preference to male applicants for some cottage parent positions (in at least some male cottages) and to female applicants for some cottage parent positions (in at least some female cottages).[26]

Beyond these objectively verifiable preferences, however, the state's proffered explanations do not fare as well. The after-the-fact explanations offered by the state's witnesses did not have the ring of truth; they were unpersuasive and often contradictory.

For example, Sunland hired Jeanette Bruner over plaintiffs Gwenevere Long and Jennifer Pittman for cottage parent position 11986 on January 23, 1981. The state proffered explanations that, first, Ms. Bruner was 40 years old and thus more mature, and second, Ms. Bruner raised six children, which is important experience. I find these explanations pretextual. Plaintiff Marinda Hayes was also approximately 40 years old when she applied for various positions, but that never seemed to help her. Plaintiff Erma Calhoun raised five children, but that never seemed to help her. Factors that are cited only when they help whites, not African Americans, are often pretexts for racial discrimination; I find that to be the case with respect to the reasons given for selecting Ms. Bruner. In fact, Ms. Long was a temporary employee at Sunland at the time of the application and had experience at other nursing facilities; Ms. Pittman had been a temporary employee at Sunland and a teacher's aide at an elementary school; and Ms. Bruner was an Avon salesperson. If there was a legitimate race-neutral reason for hiring Ms. Bruner over Ms. Long and Ms. Pittman, this record does not reflect it.

Similarly, the state's proffered explanation for choosing William Pierce over Ms. Long and Ms. Pittman for cottage parent position 11946 on May 12, 1982, was that he had experience with Sunland clients and staff through his experience with the Washington County School Board. But as of the date of his application, Mr. Pierce had been a teacher's aide for only a month. His other work experience was less than a year shipping and receiving at a uniform company in Tennessee. Ms. Long had spent six months as a CETA employee at Sunland itself and had two years experience at a nearby nursing facility. Ms. Pittman had three months experience at Sunland itself and a year as a teacher's aide in an elementary school. If there was a legitimate race-neutral reason for hiring Mr. Pierce over Ms. Long and Ms. Pittman, this record does not reflect it.

The state's proffered explanation for choosing Rhonda Reddoch over plaintiff Queen Granberry for cottage parent position 12054 filled October 26, 1979, was that Ms. Reddoch had two children and a high school diploma. Ms. Reddoch had not worked for seven years as of that time. Plaintiff Erma Calhoun had five children and a high school diploma but was never hired; the state did not attempt to explain why Ms. Reddoch's children and high school diploma netted her a job while Ms. Calhoun's similar credentials did not. In any event, Ms. Granberry, who lost out to

---

**26.** The state's testimony on the gender preference was not a model of clarity, perhaps because the state was not sure such a gender preference was legal. I assume, for purposes of this case, that the state could properly prefer cottage parents of the same gender as residents for the performance of some of the cottage parents' duties (for example, assisting residents with bathing or toilet functions). In any event, plaintiffs' complaint in the case at bar alleges only racial discrimination, not gender discrimination. Thus, for purposes of this case, if the state applied any gender preference equally to whites and African Americans, the gender preference would not provide a basis for recovery.

Ms. Reddoch, also had a high school diploma, and, in addition, Ms. Granberry had cared for her grandmother and a deaf mute aunt for many years, had worked for a year as a teacher's aide and at Sunland as a temporary CETA employee, and had been continuously employed for eight years (a factor cited by the state as a positive factor for successful white applicants). If there was a legitimate race-neutral reason for hiring Ms. Reddoch over Ms. Granberry, this record does not reflect it.

The state's proffered reason for choosing Mary Lou Elmore over Ms. Granberry for cottage parent position 12031 on February 15, 1980, was that Ms. Elmore was at that time a temporary worker at Sunland. From Ms. Elmore's application, however, it appears she did not even meet the minimum qualifications for the cottage parent position; she had neither a high school education nor enough experience to substitute year for year for the missing education, as required by the written job qualifications. In any event, Ms. Granberry was clearly better qualified than Ms. Elmore. I find the explanation for the hiring of Ms. Elmore pretextual.

The state's proffered reason for hiring James Gesslein over plaintiff Marinda Hayes for cottage parent position 12005 was that he had 40 hours of junior college credit and had been an orderly at a nursing home. Mr. Gesslein's application reflected one semester of junior college and six months work at the nursing home.[27] Ms. Hayes had two years of college and almost 18 months as a part-time care giver. If there was a legitimate race-neutral reason for hiring Mr. Gesslein over Ms. Hayes, this record does not reflect it.

The state's proffered reason for choosing Donald Perry over plaintiff Jennifer Pittman for service aide position 11630 on April 15, 1983, was that Mr. Perry had done a good job while working at Sunland on a prison release program. Mr. Perry had no high school diploma, had served time in prison for grand theft, and listed as work experience only two day laborer positions of less than a year combined. Ms. Pittman had a high school diploma, was at that time a current Sunland custodial employee (thus qualifying for the virtually dispositive preference for current employees), had additional prior experience at Sunland, and had additional experience as a teacher's aide. There is no evidence that Ms. Pittman had not done good work in her two Sunland positions. I find pretextual the assertion that Mr. Perry was hired because of his good work in the prison release program.

Finally, the state's proffered reasons for choosing Linwood Daffin over plaintiffs Erma Calhoun and Queen Granberry for cottage parent position 11963 on November 16, 1979, included that this was a position in a male cottage, that Mr. Daffin had a bachelor's degree, that Mr. Daffin worked with other inmates as a chaplain while he was serving a two-year drug trafficking sentence, and that Mr. Daffin had changed jobs four times in three years, showing his willingness to work. But the state interviewed at least three women for the position (including Ms. Granberry), suggesting this was not a "male position." Ms. Calhoun and Ms. Granberry both had experience in patient care facilities much more relevant than experience as a chaplain to fellow prisoners. Mr. Daffin's frequent job changes were hardly a positive factor.[28] And in any event, Ms. Calhoun

27. Mr. Gesslein's employment history also showed frequent job changes, presumably a negative factor.

28. Indeed, the state cited on another occasion a successful white applicant's long tenure in a job as a positive factor, showing stability. The pattern of the state's explanations on this at trial was that long tenure of a successful white applicant was a positive factor, and frequent job changes by a successful white applicant was a positive factor. Even not having been employed at all for a long period was not a negative factor for a successful white applicant. But the plaintiffs' work records were never a positive factor, or at least not positive enough to overcome whatever work record the successful white applicant happened to have. The state's explanations were pretextual.

and Ms. Pittman also were willing to work (as confirmed by their own work histories and by their many applications to Sunland). Commendable as Sunland's willingness to offer employment to a convicted felon may have been, the state did not suggest this was a reason for preferring Mr. Daffin over applicants with no criminal record. I find pretextual the state's proffered reasons for selecting Mr. Daffin over Ms. Calhoun and Ms. Pittman.

### D. *Intentional Discrimination*

■ That plaintiffs have shown that some of the state's proffered explanations for hiring decisions were pretextual does not end the matter. A finding of pretext permits, but does not require, a finding that a plaintiff has been the victim of intentional discrimination.

I find that each of these five plaintiffs was well qualified for the positions at issue. Each had a high school diploma and significant care-giving experience. Each was intelligent, poised and articulate when she testified at trial.

I find that each plaintiff would have been hired if the hiring process had been conducted without racial discrimination. I find that each plaintiff was a victim of intentional racial discrimination in each instance for which she established a prima facie case and either (1) the state failed to present a legitimate non-discriminatory reason for its decision or (2) the state's proffered reason was pretextual. Intentional racial discrimination is the only reasonable explanation for the clear pattern of hiring decisions at Sunland during the period 1976–1984. Had it not been for that discrimination, plaintiffs would have been hired for jobs that instead went to whites.

### Conclusion

The five plaintiffs now before the court were well qualified for positions for which they applied at Sunland during the 1976–1984 period. But for intentional racial discrimination, they would have been hired. Accordingly,

IT IS ORDERED:

Plaintiffs Gwenevere Long, Queen Granberry, Marinda Hayes, Jennifer Pittman and Erma Calhoun are hereby determined to be entitled to prevail on the issue of liability, subject to defenses relating to the filing of administrative charges. I do *not* direct the entry of judgment under Federal Rule of Civil Procedure 54(b). By separate notice, the clerk shall set a scheduling conference, at which the scope, sequence and timing of further proceedings, including the desirability of further mediation, will be addressed. The attorneys shall confer with one another at least five days prior to the scheduling conference in a good faith effort to reach agreement on all such issues and shall be prepared to announce any agreements on such issues at the scheduling conference.

### APPENDIX 1

### GWENEVERE LONG

### I. *Successful Claims*

A. **Claims for which no race neutral reason is given:**

1. Cottage parent position 12031 awarded to Mary Elmore on 2/15/80

2. Cottage parent position 12014 awarded to Syble Lawrence on 10/17/80

3. Cottage parent position 12006 awarded to John Turnbow in January 1981 (The state's exhibits concerning this position indicate that Mr. Turnbow was a veteran, but the state has presented no testimony that this was a reason Mr. Turnbow was selected. In light of Sunland's inconsistent record with respect to preferring veterans, it cannot be assumed that this is why Mr. Turnbow was chosen.)

4. Cottage parent position 12005 awarded to Luther Medlock on or about 7/31/81

5. Cottage parent position 12052 Robert Edwards on 8/24/81

6. Cottage parent position 12004 awarded to Arthur Ingram on or about 6/11/82

7. Cottage parent positions 11972 and 12007 awarded to Evla Woods and Judy Chambliss respectively on or about 6/2/81

8. Cottage parent position 12036 awarded to Penny Crutchfield on 8/17/82

9. Cottage parent position 12050 awarded to William Pratt in March 1983

10. Cottage parent position 11928 awarded to Lori Green on 3/18/83

11. Laundry worker I position 11607 awarded to Wanda Poole on 3/24/83

12. Cottage parent position 39433 awarded to Lucille Harrison on or about 7/21/81

13. Cottage parent position 12036 filled by Voncile Murdock on or about 8/21/81

14. SSA position 11626 filled by Nettie Daniels on or about 8/14/81

15. SSA position 11655 filled by Sara Standland on or about 8/14/81

16. SSA position 11659 filled by Elizabeth Hamilton on or about 8/14/81

17. Cottage parent position 11921 filled by Rickey Jones on an unspecified date

18. Cottage parent position 12048 filled by George K. Williams on or about 9/26/80

19. Cottage parent position 12006 filled by Mary Medlock on or about 3/20/81

**B. Claims for which the reason given is pretextual:**

1. Cottage parent position 12017 awarded to Annie Roberts on or about 10/24/80 (alleged reason is pretextual; Ms. Long had more relevant job experience)

2. Cottage parent position 11986 awarded to Jeanette Bruner on 1/23/81 (alleged reason is pretextual: see text)

3. Cottage parent position 11946 awarded to William Pierce on 5/12/82 (alleged reason is pretextual: see text)

4. Resident training instructor position 16843 awarded to Jennie Jackson in or about October 1980 (alleged reason is pretextual; Ms. Jackson's qualifications were not superior to Ms. Long's)

## II. *Unsuccessful Claims*

### A. Claims for which Ms. Long fails to make a prima facie case:

1. Cottage parent position 11984 advertised on or about 5/20/82 (unclear position was ever filled, or by whom)

2. Cottage parent position 11968 awarded to Lola Daniels on 2/15/80 (Ms. Daniels is black)

3. Cottage parent position 11923 awarded to Ola Smith on 9/26/80 (Mr. Smith is black)

4. Cottage parent position 11921 awarded to Dennis Hines on 1/23/81 (Mr. Hines is black)

5. Cottage parent position 11974 advertised in July 1981 (position went unfilled)

6. Cottage parent position 12043 awarded to Ophelia Thompson on 1/16/81 (Ms. Thompson is black)

7. Cottage parent position 12054 advertised on or about 8/12/82 (position was unfilled)

8. Cottage parent position 11974 filled in July 1982 (winning applicant was black)

9. Nursing assistant position 12110 advertised on or about 6/14/83 (unclear if filled, or by whom)

10. Resident training instructor position 42224 awarded to Wilma Robinson on 8/3/82 (Ms. Robinson is black)

11. Cottage parent position 12018 awarded to Crushwell Swilley on 7/24/81 (Mr. Swilley is black)

12. Laundry worker I position 11603 awarded to Frances Calhoun on 3/24/83 (Ms. Calhoun is black)

13. Resident training instructor position 40012 awarded to Mildred McLeroy on or about 9/26/80 (Ms. McLeroy is black)

14. Resident training instructor position 40002 awarded to Mary Neal (Ms. Neal is black)

15. Cottage parent position 11959 filled by Danny Sylvester on or about 7/2/82 (Mr. Sylvester is black)

16. Cottage parent position 11964 filled by Lorraine Daniels on or about 7/2/82 (Ms. Daniels is black)

17. Cottage parent position 11977 filled by Sharon Lettinhand on or about 7/23/82 (Ms. Lettinhand is black)

18. Cottage parent position 12052 filled by Oliver Williams on or about 7/23/82 (Mr. Williams is black)

19. RTI position 16286 filled by Lucille Gilbert on or about 11/7/80 (Ms. Gilbert is black)

20. Cottage parent position 12033 filled by Lyndell Johnson on or about 4/1/83 (Mr. Johnson is black)

21. Cottage parent position 11948 filled by Patricia Evans on or about 4/1/83 (Ms. Evans is black)

22. Resident training instructor position 16297 filled by Plassie Rhynes on or about 12/5/80 (Ms. Rhynes is black)

23. Cottage parent position 12013 filled by Dorothy Brown on or about 8/14/81 (Ms. Brown is black)

24. SSA position 11656 filled by Carrie Godwin on or about 8/14/81 (Ms. Godwin is black)

25. SSA position 11658 filled by Nina Long on or about 8/14/81 (Ms. Long is black)

26. RTI position 16287 filled by Ralph Borders on or about 6/18/82 (Mr. Borders is black)

27. Cottage parent position 11931 filled by Gloria Williams on or about 6/25/82 (Ms. Williams is black)

28. Laundry worker I position 11605 filled by Edna Truitt on or about 8/13/82 (Ms. Truitt is black)

29. RTI position 32339 filled by Ruth Paramore on or about 8/27/82 (Ms. Paramore is black)

30. Cottage parent position 11919 filled by Lillie Blue on or about 3/25/83 (Ms. Blue is black)

31. Cottage parent position 11910 filled by Otis Pittman on or about 7/2/82 (Mr. Pittman is black)

32. RTI position 16298 filled by Mary Highsmith on or about 2/2/80 (Ms. Highsmith is black)

33. Cottage parent position 12043 filled by Earlene Paramore on or about 8/1/80 (Ms. Paramore is black)

34. Cottage parent position 11990 filled by Joseph Davis on or about 11/11/80 (Mr. Davis is black)

35. RTI position 16276 advertised on or about 11/11/80 (position frozen)

36. RTI position 32341 advertised on or about 12/12/80 (position readvertized)

37. RTI position 39435 advertised on or about 12/19/80 (position frozen)

38. Cottage parent position 11938 advertised on or about 9/26/80 (position never opened)

39. Cottage parent position 12042 advertized on or about 9/26/80 (position never opened)

40. Cottage parent position 12041 filled by Donald Williams at an unspecified date in 1980 (Mr. Williams is black)

41. Service aide position 11648 filled by Gerald Williams on or about 4/20/82 (Mr. Williams is black)

42. Service aide position 11654 filled by Dorothy Mindy on or about 4/20/82 (Ms. Mindy is black)

43. RTI position 40035 advertised on or about 7/13/82 (unclear if ever filled, or by whom)

44. Cottage parent position 11944 filled by Hosie McCollough on or about 7/2/82 (Mr. McCollough is black)

**B. Claims for which there is a legitimate, non-pretextual reason:**

1. Cottage parent position 11909 awarded to Ricky Bragg on or about 1/16/81 (non-pretextual reasons given: existing employee preference; gender preference)

2. Cottage parent position 12055 awarded to Chalmas Stone on 1/16/81 (non-pretextual reason given: existing employee preference)

3. Cottage parent position 11943 awarded to John Hagan on 7/20/81 (non-pretextual reason given: existing employee preference)

4. Cottage parent position 12034 awarded to Virgil Rowe on 7/20/81 (non-pretextual reason given: gender preference)

5. Cottage parent position 12008 awarded to Clara Williams on 6/22/82 (non-pretextual reasons given: existing employee preference, and Ms. Long was precluded from getting this position by anti-nepotism rules because she had a relative working at this cottage)

6. Cottage parent position 11990 awarded to Larry Raines on 7/23/82 (non-pretextual reason given: existing employee preference)

7. Cottage parent position 11940 awarded to James Smith on 8/17/82 (non-pretextual reason given: Mr. Smith received stellar recommendation from current employer)

8. Nursing assistant position 12115 awarded to Michael Sellers on 9/26/80 (non-pretextual reason given: gender preference)

9. Nursing assistant position 32289 awarded to Judson Hand on 6/14/83 (non-pretextual reason given: gender preference)

10. Resident training instructor position 40011 awarded to Kathryn Neel on 9/26/80 (non-pretextual reason given: existing employee preference)

11. Resident training instructor position 40014 awarded to Ann Frick on 9/26/80 (non-pretextual reason given: existing employee preference)

12. Resident training instructor position 12137 awarded to Quentin Long on 10/24/80 (non-pretextual reason given: veteran's preference and military record)

13. Cottage parent position 12001 awarded to Monroe Bryan on 5/12/82 (non-pretextual reason given: Mr. Bryan spent a number of years at Sunland in vocational training)

14. Cottage parent position 12041 awarded to Alva Mercer on 3/23/83 (non-pretextual reason given: Mr. Mercer had been resident training instructor for three years)

15. Resident training instructor position 32336 awarded to Edward Tyus on 11/7/80 (non-pretextual reason given: existing employee preference)

16. Resident training instructor position 32347 awarded to Addie Bellamy on 11/7/80 (non-pretextual reason given: existing employee preference)

17. Resident training instructor position 40013 awarded to Olive Green (non-pretextual reason given: existing employee preference)

18. Resident training instructor position 42225 awarded to Billy Lipford

on 8/3/82 (non-pretextual reason given: existing employee preference)

19. Resident training instructor position 42212 awarded to Catherine Nichols on 3/21/83 (non-pretextual reason given: preference for hiring full-time state employees)

20. Cottage parent position 12011 filled by Martha Wade on or about 3/5/80 (non-pretextual reason given: existing employee preference)

21. Cottage parent position 11966 awarded to Johnny Baxley on 10/24/80 (non-pretextual reason given: gender preference)

22. Cottage parent position 11961 awarded to Michael King and filled by Anthony McMillan on or about 8/24/81 (non-pretextual reason given: gender preference)

23. Food service aide position 11662 awarded to Ellen Galland on 3/14/83 (non-pretextual reason given: Ms. Galland had prior food service experience)

24. Nursing assistant position 32289 filled by Kenneth Grantham on 3/9/83 (non-pretextual reason for not hiring Ms. Long: another applicant, not the winner, had superior qualifications)

25. Cottage parent position 11918 awarded to Hilda Smith on 3/25/83 (non-pretextual reason for not hiring Ms. Long: another applicant, not the winner, had superior qualifications)

26. Resident training instructor position 32335 awarded to Linda Wright on May 1982 (non-pretextual reason: Ms. Wright, who had been a cottage parent for over a year, was more qualified that Ms. Long)

27. Resident training instructor position 32326 awarded to Susan Weeks on 6/18/82 (non-pretextual reason: Ms. Weeks, who had been a cottage parent for over two years, was more qualified than Ms. Long)

28. Cottage parent position 12017 filled by Zadie Lewis on or about 9/19/80 (non-pretextual reason: Ms. Lewis, who had been an attendant at FSU hospital caring for the mentally ill for seven to eight years, was more qualified than Ms. Long)

## APPENDIX 2

## QUEEN GRANBERRY

### I. *Successful Claims*

**A. Claims for which no race neutral reason is given:**

1. Cottage parent position 12107 awarded to Carlos Harris on 10/5/79

2. Cottage parent position 12030 awarded to John Dunaway on 11/23/79

3. Cottage parent position 12053 awarded to Joe Harlow on 3/14/80

4. Cottage parent position 11986 awarded to Nancy Dykes on 2/29/80

5. Cottage parent position 12052 filled by Larry Higginbotham in February 1980

6. Cottage parent position 12015 filled by Eunice Porter in February 1980

7. Cottage parent position 11966 filled by Jerry Shelby in or about July 1980

8. Cottage parent position 11932 filled by Larry Krause on or about July 1980

9. Cottage parent position 11952 filled by Robert Perdue on or about July 1980

10. RTI position 40024 filled by Betty Brogdon on or about 8/21/80

11. RTI position 40025 filled by Doris New on or about 8/21/80

12. RTI position 40026 filled by Dianne Worthington on or about 8/21/80

**B. Claims for which the reason given is pretextual:**

1. Cottage parent position 11963 awarded to Linwood Daffin on 11/16/79 (alleged reason is pretextual: see text)

2. Cottage parent position 12054 awarded to Rhonda Reddoch on 10/26/79 (alleged reason is pretextual: see text)

3. Cottage parent position 12036 awarded to Carol Davis on 5/9/80 (alleged reason is pretextual: Ms. Davis had no relevant job experience and was not more qualified)

4. Cottage parent position 12031 awarded to Mary Lou Elmore on 2/15/80 (alleged reason is pretextual: see text)

## II. *Unsuccessful Claims*

**A. Claims for which Ms. Granberry fails to make a prima facie case:**

1. Unspecified cottage parent position filled in April 1978

2. Unspecified cottage parent position filled in May 1978

3. Cottage parent position 11927 listed on 10/15/79 (position was reclassified)

4. Cottage parent position 12043 awarded to Earlene Paramore on 8/1/80 (Ms. Paramore is black)

5. Cottage parent position 11923 awarded to Ola Smith on 9/26/80 (Mr. Smith is black)

6. Unspecified food service aide position filled in April 1978

7. Clerk typist II position 32244 awarded to Gail Edenfield on 10/26/79 (Ms. Granberry did not prove she was qualified for this position)

8. Resident training instructor position 40012 awarded to Mildred McLeroy on or about 9/26/80 (Ms. McLeroy is black)

9. Resident training instructor position 40002 awarded to Mary Neal on or about 9/26/80 (Ms. Neal is black)

10. Unspecified cottage life position filled in September 1977 (job qualifications and race unknown)

11. Cottage parent position 12038 filled by Donald Williams on or about 10/26/79 (Mr. Williams is black)

12. Cottage parent position 11968 filled by Lola Daniels on or about 2/15/80 (Ms. Daniels is black)

13. RTI position 39383 filled by David Hunter on or about 8/21/80 (Mr. Hunter is black)

14. RTI position 40027 advertised on or about 8/21/80 (position lost)

15. RTI position 40028 advertised on or about 8/21/80 (position lost)

**B. Claims for which there is a legitimate, non-pretextual reason:**

1. Cottage parent position 12003 awarded to James Goodwin on 3/7/80 (non-pretextual reason given: gender preference)

2. Cottage parent position 11967 awarded to Haise Eddins on 3/7/80 (non-pretextual reason given: gender preference)

3. Cottage parent position 11977 awarded to Harry Williams on 2/29/80 (non-pretextual reason given: gender preference)

4. Cottage parent position 11959 awarded to Edgar Glisson on 8/1/80 (non-pretextual reason given: gender preference)

5. Resident training instructor position 40011 awarded to Kathryn Neel on or about 9/26/80 (non-pretextual reason given: existing employee preference)

6. Resident training instructor position 40014 awarded to Ann Frick on or about 9/26/80 (non-pretextual reason given: existing employee preference)

7. Resident training instructor position 40013 awarded to Olive Green on or about 9/26/80 (non-pretextual reason given: existing employee preference)

8. Cottage parent position 12004 awarded to Edward McCoy on 10/26/79 (non-pretextual reason given: gender preference)

9. Cottage parent position 12053 awarded to Charles Harrell on 10/26/79 (non-pretextual reason: Mr. Harrell was current, five-year employee of Florida State Hospital)

10. Cottage parent position 12011 awarded to Martha Wade on 3/5/80 (non-pretextual reason given: existing employee preference)

11. Cottage parent position 12017 awarded to Patricia Anglin on 5/9/80 (non-pretextual reason: Ms. Anglin's experience as state employee in field of retardation)

12. Cottage parent position 12051 awarded to Sue Weeks on 8/1/80 (non-pretextual reason: Ms. Weeks' experience and qualifications)

13. Cottage parent position 12037 awarded to Sue Ditty on 9/12/80 (non-pretextual reason: Ms. Ditty's experience and qualifications; existing employee preference)

14. Cottage parent position 11986 awarded on 9/28/79 to Estelle Godfrey (non-pretextual reason: Ms. Godfrey's experience and qualifications (she had been a psych. aide at Florida State Hospital for 18 years))

15. Cottage parent position 11988 awarded to Linda Williams on 3/14/80 (non-pretextual reason: Ms. Williams's experience and qualifications (she had been a social worker's assistant for over two years))

16. Cottage parent position 12017 awarded to Zadie Lewis on 9/26/80 (non-pretextual reason: Ms. Lew-

is's experience and qualifications (she had been an attendant at Florida State hospital caring for the mentally ill for seven to eight years))

## APPENDIX 3

## MARINDA HAYES

### I. *Successful Claim*

#### A. Claim for which the reason given is pretextual:

1. Cottage parent position 12005 awarded to James Gesslein on 2/26/82 (alleged reason is pretextual: see text)

### II. *Unsuccessful Claims*

#### A. Claim for which Ms. Hayes fails to make a prima facie case:

1. Clerk typist II position 32244 awarded to Erma Hendrix on or about 2/11/83 (Ms. Hayes has not shown she was qualified for this position)

#### B. Claim for which there is a legitimate, non-pretextual reason:

1. Cottage parent position 11904 awarded to Mary McKinnie on 2/26/82 (non-pretextual reason: existing employee preference)

## APPENDIX 4

## JENNIFER PITTMAN

### I. *Successful Claims*

#### A. Claims for which no race neutral reason is given:

1. Cottage parent position 11920 filled by Galitan Joe Canman, Jr. in June 1980

2. Cottage parent position 12051 filled by Susan Weeks in July 1980 (no race neutral reason given; although there was testimony at trial that Ms. Weeks was more qualified than plaintiff Granberry, there was no

testimony that Ms. Weeks was more qualified than plaintiff Pittman)

3. Cottage parent position 12036 filled by Patricia Smith in August 1980 (vague speculation at trial that Ms. Smith had previously worked at Florida Department of Health and Rehabilitative Services insufficient)

4. Cottage parent position 12050 filled by Marsha Raines in November 1980

5. Cottage parent position 12006 filled by Mary Medlock in December 1980

6. Cottage parent position 11875 awarded to Alberta Suggs on 1/16/81

7. Cottage parent position 12036 awarded to Charles Jones on or about 5/29/81 (no race neutral reason given; Sunland apparently interviewed only males for this position, but the state offered no evidence that gender preference played any role in the selection)

8. Cottage parent position 11979 awarded to William Harris on or about 6/5/81 (no race neutral reason given; Sunland apparently interviewed only males for this position, but the state offered no evidence that gender preference played any role in the selection)

9. Cottage parent position 11967 awarded to Sidney Stanley on or about 6/12/81

10. Cottage parent position 12005 awarded to Luther Medlock on or about 7/31/81 (no race neutral reason given; Sunland apparently interviewed only males for this position, but the state offered no evidence that gender preference played any role in the selection)

11. Cottage parent position 11921 awarded to Ricky Jones in June 1981

12. Cottage parent position 11946 awarded to John Wallace on 7/3/81 (no race neutral reason given; Sunland apparently interviewed only males for this position, but the state offered no evidence that gender preference played any role in the selection)

13. Cottage parent positions 12053 and 12015 filled by Ricky Arivett and Laura Robbirds, respectively, on or about 9/11/81

14. Cottage parent position 12031 awarded to Danny Gilley on or about 1/22/82 (no race neutral reason given; the state's exhibits indicate Mr. Gilley was a veteran, but the state has presented no testimony that this was a reason Mr. Gilley was selected, and in light of Sunland's inconsistent record with respect to preferring veterans, it cannot be assumed that this was a reason for Mr. Gilley's selection)

15. Cottage parent position 12003 filled by Margaret Petropak in November 1981

16. Cottage parent position 11970 filled by Betty Alford on or about 2/12/82

17. Cottage parent position 11970 filled by Karen Freni on or about 2/12/82

18. Cottage parent position 11931 filled by Judith Taunton on or about 3/12/82

19. Cottage parent position 11936 awarded to Carol Stanley on or about 3/12/82

20. Cottage parent position 11966 awarded to William Ingram on 3/12/82 (no race neutral reason given; Sunland apparently interviewed only males for this position, but the state offered no evidence that gender preference played any role in the selection)

21. Cottage parent position 12014 filled by Jimmy Baumgartner on or about 6/11/82 (no race neutral reason given; Sunland apparently interviewed only males for this position, but the state offered no evidence that gender preference played any role in the selection)

22. Cottage parent position 11984 filled by Eula Dykes in June 1982

23. Cottage parent position 12036 filled by Penny Crutchfield on or about 8/27/82

24. Cottage parent position 11940 filled by James L. Smith on or about 8/27/82

25. Cottage parent position 11935 filled by Edward Williams on or about 8/20/82 (no race neutral reason given; Sunland apparently interviewed only males for this position, but the state offered no evidence that gender preference played any role in the selection)

26. Cottage parent position 12041 awarded to Alva Mercer on or about 4/1/83

27. Cottage parent position 11965 awarded to Derwood Kirkland on 3/11/83

28. Cottage parent position 11960 filled by Joyce Mathews in February 1983

29. Cottage parent position 11938 filled by Carol Standland on or about February 1983

30. Cottage parent position 12050 awarded to William Pratt on 3/25/83

31. Cottage parent position 11928 awarded to Lori Green on 3/18/83

32. Cottage parent position 11954 awarded to Harry Lawrence on 4/11/83

33. Cottage parent position 12007 awarded to Edna Raines on or about 5/20/83

34. Cottage parent position 11965 awarded to Richard Ham on or about 5/20/83

35. Cottage parent position 11943 filled by John Brown on or about 7/1/83

36. Cottage parent position 12043 filled by Diane Mercer on or about 7/1/83

37. Cottage parent position 12029 awarded to Clara Jackson on 5/27/83

38. Cottage parent position 11926 filled by Marily Brown in May 1983

39. Cottage parent position 12016 filled by Nadine Newsome on or about 7/22/83

40. Service aide position 11634 awarded to Clara Williams on 7/17/81

41. Service aide position 11667 filled by Mary Edenfield in November 1982

42. Service aide position 11636 awarded to Barbara Dial in February 1983

43. Service aide position 11634 awarded to Glenda Barnett on or about 4/29/83

44. Service aide position 11662 awarded to Ellen Galland on or about 3/25/83

45. Custodial worker position 11714 awarded to Freddie Alday on or about 7/3/81

46. Custodial worker position 16661 awarded to Michael Shaw on or about 7/3/81

47. Custodial worker position 16661 awarded to Jeffrey Land on or about 4/22/83

48. Cottage parent position 12042 filled by Naomi Hatcher on or about 3/12/82

49. Service aide position filled by Cindy Edenfield on or about 3/18/83

50. Cottage parent position 11938 filled by Steven Harrison on or about 3/25/83

51. Service aide position 11646 filled by Betty Lewis on or about 4/15/83

52. Cottage parent position 11986 filled by Mary Edenfield on or about 5/13/83

53. Cottage parent position 11952 filled by Robert Roath on or about 7/22/83

54. Cottage parent position 11989 filled by Danny Gilley on or about 7/22/83

55. Human service worker I position 11939 filled by Maybelle Johns on or about 2/24/84

56. Human service worker I position 12012 filled by Ruben Jackson on or about 3/9/84

57. Human service worker I position 11914 filled by Ken Mercer on or about 1/25/84

58. Human service worker I position 11916 filled by Kelley Cook on or about 3/16/84

59. Cottage parent position 12037 filled by Sue Ditty on or about 8/14/80

60. Service aide position 16636 filled by Wanda Poole on or about 4/20/82

61. Human service worker I position 12046 filled by Wander Henderson on or about 2/7/84

62. SSA position 11648 filled by Billy Grice on or about 1/27/84

63. SSA position 11665 filled by Garry Lambert on or about 1/27/84

64. SSA position 11668 filled by Murray Foran on or about 1/27/84

**B. Claims for which the reason given is pretextual:**

1. Cottage parent position 11986 awarded to Jeanette Bruner on 1/23/81 (reason given is pretextual: see text)

2. Cottage parent position 12019 awarded to Willie Roland on or about 2/25/82 (reason given is pretextual; Ms. Pittman had more relevant experience)

3. Cottage position 12005 awarded to James Gesslein on 2/26/82 (reason is pretextual; Mr. Gesslein had only limited relevant experience)

4. Cottage parent position 11946 awarded to William Pierce on 5/21/82 (alleged reason is pretextual: see text)

5. Cottage parent position 12054 awarded to James M. Smith on 2/10/83 (alleged reason is pretextual: Mr. Smith had no relevant job experience, and Ms. Pittman was a cleaning aide at Sunland at the time, thus qualifying for existing employee preference)

6. Service aide position 12077 awarded to Larry Raines on 5/22/81 (alleged reason is pretextual; Mr. Raines had virtually no relevant experience)

7. Service aid position 11646 awarded to Peggy Hooker on 1/29/82 (alleged reason is pretextual; Ms. Hooker had no relevant experience)

8. Service aide position 11648 awarded to Edna Raines on 3/19/82 (alleged reason is pretextual: Ms. Raines did not meet the minimum qualifications for the job; Ms. Pittman was clearly superior)

9. Service aide position 11630 awarded to Donald Perry on 4/15/83 (alleged reason is pretextual: see text)

10. Service aide position 11668 awarded to Carlton Burns in July 1981 (alleged reason pretextual; Mr. Burns had no relevant experience)

## II. *Unsuccessful Claims*

**A. Claims for which Ms. Pittman fails to make a prima facie case:**

1. Service aide position 11668 awarded to Harry Powell on July 1, 1983 (Mr. Powell was awarded this position at the same time that Ms. Pittman was awarded service aide position 11653; thus, Ms. Pittman was no longer available for this position)

2. Nursing assistant position 12115 filled by William Pratt in October 1980 (Ms. Pittman has not shown that she was qualified)

3. Laundry worker I position 11601 awarded to Donnie Brown on or about 5/20/83 (Ms. Pittman has not shown that she was qualified)

4. Cottage parent position 12043 filled by Ophelia Thompson in or about December 1980 (the winning applicant is black)

5. Cottage parent position 12013 filled by Dorothy Brown on 8/14/81 (the winning applicant is black)

6. Cottage parent position 12040 awarded to Marion Spates on 2/5/82 (the winning applicant is black)

7. Cottage parent position 12042 filled by Billy White in February 1982 (the winning applicant is black)

8. Cottage parent position 11922 awarded to Riley Brown on or about 3/11/93 (the winning applicant is black)

9. Cottage parent position 11974, either unfilled or filled by Elton Lewis in August 1982 (Mr. Lewis is black)

10. Service aide position 12077, either unfilled or filled by Lamar Johnson in August 1982 (Mr. Johnson is black)

11. Service aid position 11661 awarded to Frances Calhoun on 1/29/82 (the winning applicant was black)

12. Service aide position 11662 advertised in July 1982 (position unfilled)

13. Service assistant position 11636 (no evidence position was filled)

14. Nursing assistant position advertised in November 1980 (insufficient evidence of filling of position)

15. Seven OPSI positions filled in June 1983 (Ms. Pittman did not prove she was qualified)

16. Cottage parent position 11915 filled by Julius Bell on 7/3/81 (Mr. Bell is black)

17. Security guard I position 11718 filled by Charles Scott on 7/14/81 (Ms. Pittman did not prove she was qualified)

18. Motor vehicle operator I position 11672 awarded to Paul Barrentine on or about 6/3/83 (Ms. Pittman did not prove she was qualified)

19. Resident training instructor position 39411 filled by Melanie Dunaway in November 1980 (Ms. Pittman did not prove she was qualified)

20. Resident training instructor position 32336 filled by Carlos Harris in December 1980 (Ms. Pittman did not prove she was qualified)

21. Resident training instructor position 40023 awarded to Jeanette Nichols on or about 6/19/81 (Ms. Pittman did not prove she was qualified)

22. Resident training instructor positions 39382, 42228, 42230, 42231, 42232, 42227, 42225, 40013, and 42221 filled in October 1981 (Ms. Pittman did not prove she was qualified)

23. Resident training instructor position 12004 awarded to Arthur Ingram on or about 6/22/82 (Ms. Pittman did not prove she was qualified)

24. Cottage parent position 11921 filled by Dennis Hines on or about 1/23/81 (Mr. Hines is black)

25. Service aide position 11648 filled by Gerald Williams on or about 4/20/82 (Mr. Williams is black)

26. Service aide position 11654 filled by Dorothy Mincy on or about 4/20/82 (Ms. Mincy is black)

27. Cottage parent position 12107 filled by Herbert Jackson on or about 2/27/81 (Mr. Jackson is black)

28. Nursing assistant position 12115 filled by Larry Long on or about 4/3/81 (Mr. Long is black)

29. Cottage parent position 11966 filled by Nathan Holland on or about 5/22/81 (Mr. Holland is black)

30. Service aide position 11637 filled by Oliver Williams on or about 5/22/81 (Mr. Williams is black)

31. Cottage parent position 11919 filled by Napoleon Pittman on or about 7/3/81 (Mr. Pittman is black)

32. Cottage parent position 11938 filled by Lucille Crawford on or about 7/17/81 (Ms. Crawford is black)

33. Cottage parent position 12018 filled by Crushall Swilley on or about 7/24/81 (Mr. Swilley is black)

34. Cottage parent position 11955 filled by Lee McKay on or about 8/14/81 (Mr. McKay is black)

35. Laundry worker position 11606 filled by Sallie Jenkins on or about 8/14/81 (Ms. Pittman has not shown she was qualified for this position; Ms. Jenkins is black)

36. Cottage parent position 11949 filled by Will Bryant on or about 8/21/81 (Mr. Bryant is black)

37. RTI position 40013 filled by Daniel Basford on or about 10/7/81 (Ms. Pittman has not shown she was qualified for this position; also, existing employee preference was a nondiscriminatory reason for selecting Mr. Basford)

38. RTI position 42236 or 42240 filled by Donna Stephens on or about 10/7/81 (Ms. Pittman has not shown she was qualified for this position)

39. Cottage parent position 12032 filled by Celeste Myrick on or about 1/22/82 (Ms. Myrick is black)

40. Cottage parent position 11947 filled by Debra Baker on or about 1/22/82 (Ms. Baker is black)

41. Cottage parent position 12028 filled by Edward Gilbert on or about 2/12/82 (Mr. Gilbert is black)

42. Cottage parent position 11917 filled by Dorothy Mullins on or about 2/12/82 (Ms. Mullins is black)

43. Service aide position 11637 filled by Mercedes Thornton on or about 2/11/83 (Ms. Thornton is black)

44. Laundry worker position 11544 filled by Charlie Bell on or about 2/25/83 (Ms. Pittman has not shown she was qualified for this position; Mr. Bell is black)

45. Cottage parent position 11919 filled by Lillie Blue on or about 3/25/83 (Ms. Blue is black)

46. Cottage parent position 12003 filled by Lyndell Johnson on or about 4/1/83 (Mr. Johnson is black)

47. Cottage parent position 11948 filled by Patricia Evans on or about 4/1/83 (Ms. Evans is black)

48. Cottage parent position 11916 filled by Angeline Russ on or about 4/15/83 (Ms. Russ is black)

49. Cottage parent position 11977 filled by Adgie Garratt on or about 4/15/83 (Ms. Garratt is black)

50. Cottage parent position 12015 filled by Andrew Johnson on or about 6/1/83 (Mr. Johnson is black)

51. Cottage parent position 12005 filled by Duane Baker on or about 8/20/82 (Mr. Baker is black)

52. Service aide position 11637 advertised on or about July 29, 1982 (unclear if ever filled, or by whom)

53. Service aide position 11653 advertised on or about July 29, 1982 (unclear if ever filled, or by whom)

54. Cottage parent position 12054 advertised on or about July 29, 1982 (unclear if ever filled, or by whom)

55. Nursing assistant position 32289 advertised on or about July 1, 1983 (unclear if ever filled, or by whom)

56. Service aide position 11667 filled by Diane Cox on or about 7/1/83 (filled on same date as Ms. Pittman received service aide position 11653)

57. Service aide position 11669 filled by Daniel Holland on or about 7/1/83 (filled on same date as Ms. Pittman received service aide position 11653)

58. Facilities II OPS position filled by Dixie Miller on or about 7/1/83 (filled on same date as Ms. Pittman

received service aide position 11653)

59. Human service worker I position 11999 filled by Adgie Garratt on or about 1/25/84 (Ms. Garratt is black)

60. Cottage parent position 12041 filled by Donald Williams on or about 10/21/80 (Mr. Williams is black)

61. Cottage parent position 12043 filled by Earlene Paramore on or about 7/21/80 (Ms. Paramore is black)

62. Cottage parent position 11990 filled by Joseph Davis on or about 11/10/80 (Mr. Davis is black)

63. RTI position 16276 advertised on or about 11/10/80 (position frozen)

64. Cottage Supervisor I position 11888 filled by Jessie Sims on or about 12/1/80 (Ms. Pittman has not shown she was qualified for this position)

65. Cottage parent position 11974 advertised on or about 12/18/80 (never filled)

66. Cottage parent position 12107 advertised on or about 12/18/80 (never filled)

67. Cottage parent position 11939 filled by Jessie Davis on or about 10/10/80 (the winner is black)

68. Store clerk position 11627 advertised on or about 6/29/81 (not filled)

69. Laundry worker I position 11606 advertised on or about 7/16/81 (not filled)

70. Cottage parent position 12038 filled on or about 8/10/81 by Zannie Williams (Ms. Williams is black)

71. Cottage parent position 12010 filled by George Cobb on or about August 10, 1981 (Mr. Cobb is black)

72. RTI position 42229 filled by Lucille Crawford on or about 10/8/81 (Ms. Pittman has not shown she was qualified; Ms. Crawford is black)

73. RTI position 42234 filled by Latonia Mack on or about 10/8/81 (Ms. Pittman has not shown she was qualified; Ms. Mack is black)

74. RTI position 42226 filled by Sandra Bell on or about 10/8/81 (Ms. Pittman has not shown she was qualified; Ms. Bell is black)

75. Cottage parent position 12013 filled by Lillie Blue on or about 10/8/81 (Ms. Blue is black)

76. Custodial worker position 11627 advertised on or about 5/8/81 (readvertised)

77. Trades helper position 11681 filled by James Harrison on or about 6/11/81 (Ms. Pittman has not shown she was qualified)

78. Service aide position 11627 advertised on or about 6/23/81 (not filled)

79. Store clerk position 11594 filled by Terry Neal on or about 7/2/81 (Ms. Pittman has not shown she was qualified)

80. Service aide supervisor position 11656 filled by Carrie Godwin on or about 7/2/81 (Ms. Pittman has not shown she was qualified; Ms. Godwin is black)

81. Service aide supervisor position 11655 filled by Elizabeth Hamilton on or about 7/2/81 (Ms. Pittman has not shown she was qualified)

82. Service aide supervisor position 11626 filled by Nettie Daniels on or about 7/2/81 (Ms. Pittman has not shown she was qualified)

83. Service aide supervisor position 11659 filled by Sara Daniels on or about 7/2/81 (Ms. Pittman has not shown she was qualified)

84. Service aide supervisor position 11658 filled by Nina Long on or about 7/2/81 (Ms. Pittman has not shown she was qualified; Ms. Long is black)

85. RTI position 12143 filled by Muriel Annis on or about 10/8/81 (Ms. Pittman has not shown she was qualified)

86. Cottage parent position 11715 advertised on or about 10/30/81 (position lost)

87. Cottage parent position 11919 advertised on or about 10/30/81 (position readvertised)

88. Cottage parent position 12040 advertised on or about 10/30/81 (position readvertised)

89. Cottage parent position 12019 advertised on or about 10/30/81 (position readvertised)

90. RTI position 42237 filled by Michael Jackson on or about 10/5/81 (Ms. Pittman has not shown she was qualified)

91. RTI position 42238 filled by Bruce Taylor on or about 10/5/81 (Ms. Pittman has not shown she was qualified)

92. RTI position 42239 filled by Rhonda Rooks on or about 10/5/81 (Ms. Pittman has not shown she was qualified)

93. RTI position 42240 filled by Helen Hendrix on or about 10/5/81 (Ms. Pittman has not shown she was qualified)

94. RTI position 42236 filled by Daisy Barrentine on or about 10/5/81 (Ms. Pittman has not shown she was qualified)

95. Service aide position 11650 filled by Lillie Blue on or about 1/25/82 (Ms. Blue is black; also, existing employee preference was a non-pretextual reason for selecting Ms. Blue)

96. Service aide position 11646 filled by Janice Vinson on or about 1/11/82 (Ms. Vinson is black)

97. Cottage parent position 12014 advertised on or about 2/25/82 (position readvertised)

98. Cottage parent position 12015 filled by Andrew Johnson on or about 5/5/82 (Mr. Johnson is black)

99. Cottage parent position 11994 filled by Hosie McCollough on or about 8/6/82 (the winner is black)

100. Service aide position 11650 filled by Toretha Calhoun on or about 4/4/83 (Ms. Calhoun is black)

101. Service aide position 11661 filled by Gail Batson on or about 4/4/83 (Ms. Batson is black)

102. Custodial worker position 16661 advertized on or about June 14, 1983 (position not filled)

103. Cottage parent position 12014 filled by Mitchell Dickens on or about 1/10/83 (Mr. Dickens is black)

104. Cottage parent position 44166 filled by Larry Long on or about 8/23/83 (Mr. Long is black; also, existing employee preference was a non-pretextual reason for selecting Mr. Long)

105. Cottage parent position 44167 filled by Emma Jennings on or about 8/23/83 (Ms. Jennings is black; also, existing employee preference was a non-pretextual reason for selecting Mr. Long)

106. Cottage parent position 44169 filled by Bernice Patterson on or about 8/23/83 (Ms. Patterson is black; also, existing employee preference was a non-pretextual reason for selecting Ms. Patterson)

107. Cottage parent position 11920 filled by Frank Granberry on or about 12/13/83 (Mr. Granberry is black; also, existing employee preference was a non-pretextual reason for selecting Ms. Granberry)

108. Service aide position 11634 filled by Mary Long on or about 12/13/83 (Ms. Long is black)

**B. Claims for which there is a legitimate, non-pretextual reason:**

1. Cottage parent position 11946 awarded to Harvey Whitehead on or about 11/11/80 (non-pretextual reasons: gender preference; veteran's preference)

2. Cottage parent position 11909 awarded to Ricky Bragg on 1/16/81 (non-pretextual reasons: existing employee preference; gender preference)

3. Cottage parent position 11715 awarded to James Edenfield in May 1981 (non-pretextual reason: existing employee preference (this was a demotion for Mr. Edenfield))

4. Cottage parent position 12034 awarded to Virgil Rowe on 7/20/81 (non-pretextual reasons: gender preference; veteran's preference)

5. Cottage parent position 12020 and 12044 awarded to Virgil Stewart and Frank Gullet on 7/27/81 (non-pretextual reasons: gender preference; veteran's preference)·

6. Cottage parent position 11919 awarded to Tim Lipford on 1/29/82 (non-pretextual reason: gender preference)

7. Cottage parent position 11932 awarded to Gary Daniels on 2/26/82 (non-pretextual reason: gender preference)

8. Cottage position 11904 awarded to Mary McKinnie on 2/26/82 (non-pretextual reason: existing employee preference)

9. Cottage parent position 12001 awarded to Monroe Bryan on or about 5/21/82 (non-pretextual reason: Mr. Bryan's experience at Sunland for many years in vocational training)

10. Cottage parent position 11983 awarded to Mark Green on 3/11/83 (non-pretextual reason: gender preference)

11. Cottage parent position 12005 filled by Chalmas Stonè on or about 1/16/81 (non-pretextual reason: existing employee preference)

12. Cottage parent position 11959 filled by Edghar Glisson on or about 7/7/80 (non-pretextual reason: gender preference)

13. Cottage parent position 11961 awarded to Michael King and filled by Anthony McMillan *in* on or about 8/24/81 (non-pretextual reason: gender preference)

14. Cottage parent position 12052 filled by Robert Edwards on 8/28/81 (non-pretextual reason: another applicant, not the winner, had qualifications superior to Ms. Pittman's)

15. Cottage parent position 11952 filled by Billy Padgett on 5/27/83 (non-pretextual reason: another applicant, not the winner, had qualifications superior to Ms. Pittman's)

16. Cottage parent position 11918 filled by Hilda Smith on or about 3/25/83 (non-pretextual reason: another applicant, not Ms. Smith, had superior qualifications to Ms. Pittman)

17. Cottage parent position 11959 filled on or about 10/29/80 (non-pretextual reason: existing employee preference (this was voluntary demotion of existing employee))

18. Custodial worker position 11715 advertised on or about 5/8/81 (non-pretextual reason: existing employee preference (this was demotion of existing employee))

19. Cottage parent position 44165 filled by Frances Scott on or about 8/23/83 (non-pretextual reason: existing employee preference)

20. Cottage parent position 44168 filled by Kenneth Grantham on or about 8/23/83 (non-pretextual reason: existing employee preference)

21. Cottage parent position 44170 filled by Judson Hand on or about

8/23/83 (non-pretextual reason: existing employee preference)

22. Cottage parent position 12052 filled by Clifton Baxter on or about 12/13/83 (non-pretextual reason: existing employee preference)

## APPENDIX 5

## ERMA CALHOUN

### I. *Successful Claims*

**A. Claims for which no race neutral reason is given:**

1. Cottage parent position 11986 awarded to Jeanette Bruner on 1/23/81

2. Cottage parent position 11984 awarded to Linda Wright on 1/21/81

3. Cottage parent position 12006 awarded to Mary Medlock on or about 3/20/81

4. Cottage parent position 11961 awarded to Michael King on or about 9/4/81 (no race neutral reason given; Sunland apparently interviewed only males for this position, but the state offered no evidence that gender preference played any role in the selection)

5. Cottage parent position 12052 awarded to Robert Edwards on or about 8/28/81 (no race neutral reason given; Sunland apparently interviewed only males for this position, but the state offered no evidence that gender preference played any role in the selection)

6. Cottage parent position 12031 awarded to Danny Gilley on 11/22/81 (no race neutral reason given; the state's exhibits indicate Mr. Gilley was a veteran, but the state has presented no testimony that this was a reason Mr. Gilley was selected, and in light of Sunland's inconsistent record with respect to preferring veterans, it cannot be assumed that this was a reason for Mr. Gilley's selection)

7. Cottage parent position 12014 awarded to Jimmy Baumgartner on or about 6/11/82 (no race neutral reason given; Sunland apparently interviewed only males for this position, but the state offered no evidence that gender preference played any role in the selection)

8. Cottage parent position 11967 awarded to Richard Johnson on or about 11/4/83 (no race neutral reason given; Sunland apparently interviewed only males for this position, but the state offered no evidence that gender preference played any role in the selection)

9. Support service aide position 12077 awarded to Ronnie Terry on or about 2/10/84

10. Support service aide position 11665 awarded to Murray Foran on or about 3/2/84

11. Support service aide position 11668 awarded to Gary Lambert on or about 3/2/84

12. Cottage parent position 12004 awarded to Arthur Ingram on or about 6/11/82

13. Human service worker I position 12003 awarded to Larry Hatcher on or about 3/10/84

14. Human service worker I position 11914 awarded to Ken Mercer on or about 1/25/84

15. Human service worker I position 12036 awarded to Melanie Kirkland in or about March 1984

16. SSA position 12075 awarded to Dennie Williams on or about 2/29/84

17. Resident training instructor positions 39382, 42228, 42229, 42230, 42231, 42232, 42233, and/or 42234 awarded to Betty Neel, Gloria Fears, and DeMarys Watson on or about 10/5/81

18. Resident training instructor positions 42236 or 42240 awarded to Donna Stephens in October 1981

19. Cottage parent position 12036 awarded to Patricia Smith on or about 9/29/80 (vague speculation at trial that Ms. Smith had previously worked at Florida f Health and Rehabilitative Services insufficient)

20. Cottage parent position 11944 awarded to Reginald McNealy on 11/30/79

21. Cottage parent position 12036 filled by Carol Davis on or about 5/9/80

22. Cottage parent position 11952 filled by Robert Perdue in or about July 1980 (no race neutral reason given; Sunland apparently interviewed only males for this position, but the state offered no evidence that gender preference played any role in the selection)

23. Service aide position 11649 filled by Brenda Jones in or about September 1980

24. Cottage parent position 11904 filled by Ann Dougherty on or about 3/20/81

25. Cottage parent position 12036 filled by Voncile Murdock on or about 8/28/81

### B. Claims for which the reason given is pretextual:

1. Cottage parent position 11963 awarded to Linwood Daffin on 11/16/79 (alleged reason is pretextual: see text)

2. Cottage parent position 12037 awarded to Sue Ditty on or about 9/12/80 (alleged reason is pretextual; Ms. Ditty not more qualified than Ms. Calhoun)

3. Cottage parent position 12005 awarded to James Gesslien on 2/26/82 (alleged reason is pretextual; Mr. Gesslien not more qualified than Ms. Calhoun, had little relevant experience)

### II. *Unsuccessful Claims*

### A. Claims for which Ms. Calhoun fails to make a prima facie case:

1. Unspecified cottage parent position filled in February 1977 (race unknown)

2. Unspecified cottage parent position filled in May 1977 (race unknown)

3. Cottage parent position 11939 filled in September 1979 (race unknown)

4. Cottage parent position 11927 filled on 11/8/79 (race unknown)

5. Unspecified cottage parent position filled in March 1980 (race unknown)

6. Unspecified cottage parent position filled in May 1980 (race unknown)

7. Unspecified cottage parent position filled in July 1980 (race unknown)

8. Unspecified cottage parent position filled in August 1980 (race unknown)

9. Three unspecified cottage parent positions filled in September 1980 (race unknown)

10. Unspecified cottage parent position filled in October 1980 (race unknown)

11. Unspecified cottage parent position filled in November 1980 (race unknown)

12. Cottage parent position 12013 awarded to Dorothy Brown on 8/12/81 (Ms. Brown is black)

13. Cottage parent position 12043 awarded to Ophelia Thompson on or about 1/16/81 (Ms. Thompson is black)

14. Unspecified psych Aide position filled in January 1977 (race unknown)

15. Food service aide position 11646 awarded to Mary Leeks on 6/22/79 (Ms. Leeks is black)

16. Unspecified service aide position filled in October 1980 (race unknown)

17. Unspecified service aide position filled in November 1980 (race unknown)

18. Cottage parent position 11920 awarded to Robert Johnson on or about 9/19/80 (Mr. Johnson is black)

19. Resident training instructor positions 39382, 42228, 42229, 42230, 42231, 42232, 42233, and/or 42234 awarded to Lucille Crawford, Lois Bell, and Latonia Mack on or about 10/5/81 (Ms. Bell, Ms. Mack and Ms. Crawford are black)

20. Unspecified laundry worker positions awarded in November 1980 (race unknown)

21. Nursing assistant position 12112 awarded to Hosie McCullough on 1/1/82 (Mr. McCullough is black)

22. Cook II position 11624 awarded to Frances Williams on or about 7/30/82 (Ms. Calhoun has not proven she was qualified)

23. Human service worker position 12032 awarded to Mary Long in March 1984 (Ms. Long is black)

24. Cottage parent position 11923 filled by Ola Smith on or about 9/26/80 (winner is black)

25. Support service aide position 11630 (unclear when filled or by whom)

26. Cottage parent position 11921 filled by Dennis Hines on or about 1/23/81 (Mr. Hines is black)

27. Cottage parent position 12107 filled by Herbert Jackson on or about 2/27/81 (Mr. Jackson is black)

28. Cottage parent position 12032 filled by Celeste Myrick on or about 1/22/82 (Ms. Myrick is black)

29. Cottage parent position 11947 filled by Debra Baker on or about 1/22/82 (Ms. Baker is black)

30. Cottage parent position 11931 filled by Gloria Williams on or about 6/25/82 (Ms. Williams is black)

31. Laundry worker I position 11605 filled by Edna Truitt on or about 8/13/82 (Ms. Truitt is black)

32. Cottage parent position 12013 advertised on or about 10/5/81 (unclear if filled or by whom)

33. Cottage parent position 12015 filled by Andrew Johnson on or about 6/11/82 (Mr. Johnson is black)

34. SSA position 11648 filled by an unidentified person on or about 3/2/84 (insufficient information)

35. Human service worker I position 11999 filled by Adgie Garratt on or about 1/25/84 (Ms. Garratt is black)

**B. Claims for which there is a legitimate, non-pretextual reason:**

1. Cottage parent positions 11909 awarded to Rickey Bragg in January 1981 (non-pretextual reasons given: existing employee preference; gender preference)

2. Cottage parent position 11932 awarded to Gary Daniels on or about 2/26/82 (non-pretextual reason given: gender preference)

3. Service aide position 11658 awarded to Barbara Hussey on 11/15/80 (non-pretextual reasons given: existing employee preference; Ms. Hussey's food service experience)

4. Cottage parent position 11946 awarded to Harvey Whitehead on or about 11/11/80 (non-pretextual reason given: gender preference)

5. Cottage parent position 12017 awarded to Patricia Anglin on or about 5/9/80 (non-pretextual reason given: Ms. Anglin's experience as state employee in field of retardation)

6. Cottage parent position 12055 awarded to Chalmas Stone on or about 1/16/81 (non-pretextual reason given: existing employee preference)

7. Cottage parent position 11904 awarded to Mary McKinnie on or about 2/26/82 (non-pretextual reason given: existing employee preference)

8. Resident training instructor position 32344 awarded to Jannie Wells on 7/18/80 (non-pretextual reason given: existing employee preference)

9. Cottage parent position 12011 filled by Martha Wade on or about 3/5/80 (non-pretextual reason given: existing employee preference)

10. Cottage parent position 12017 filed by Zadie Lewis on or about 9/26/80 (non-pretextual reason given: Ms. Lewis's experience at Florida State Hospital caring for the mentally ill for seven to eight years)

11. Laundry worker I position 11603 filled by Jennie Hardy on or about 11/21/80 (non-pretextual reason given: Ms. Hardy's experience in laundry work)

12. Resident training instructor position 32344 filled by Jannie Wells on or about 7/18/80 (non-pretextual reason given: existing employee preference)

13. Resident training instructor position 40013 awarded to Daniel Basford in October 1981 (non-pretextual reason given: existing employee preference)